UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RICK BIRLEW,                        )
                                    )
          Plaintiff,                )
                                    )      No. 4:07CV01231 FRB
                                    )
     v.                             )
                                    )
                                    )
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
          Defendant.                )

**MEMORANDUM AND ORDER**

          This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All matters are pending
before the undersigned United States Magistrate Judge, with consent
of the parties, pursuant to 28 U.S.C. § 636(c).

**I.   Procedural Background**

          On December 8, 2005, plaintiff Rick Birlew[1] ("plaintiff")
filed applications for a Period of Disability and Disability
Insurance Benefits, and an application for Supplemental Security
Income, alleging disability beginning January 31, 2005 due to back
problems, asthma, high cholesterol, bronchitis and alcohol
problems.  (Administrative Transcript ("Tr.") at 47-53; 110-15.)
Plaintiff's applications were denied on March 21, 2006, and

---

[1]In some of the medical records in the file, plaintiff is referred to as
"Rickie Lou Birlew" and "Rickie Birlew".

plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 27-33.) On February 14, 2007, a hearing was held before ALJ Randolph E. Schum in Creve Coeur, Missouri. (Tr. 203-18.) On March 28, 2007, ALJ Schum issued his decision denying plaintiff's applications. (Tr. 10-22.) On April 19, 2007, plaintiff filed a Request for Review of Hearing Decision with defendant Agency's Appeals Council. (Tr. 6.) On June 7, 2007, the Appeals Council denied plaintiff's request for review. (Tr. 3-5.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Hearing Testimony</u>

During the hearing, the ALJ heard testimony from plaintiff and from Mr. Jeff Magrowski, a vocational expert ("VE"). Plaintiff was represented by attorney Jeffrey Bunten. Plaintiff testified that he was 49 years of age, that he had a ninth-grade education,[2] and had attended special education classes. (Tr. 204.) Plaintiff testified that he never tried to get a GED. (Tr. 205.) Plaintiff testified that he had worked for a factory for four years, and that the job had required much heavy lifting. (Tr. 206.) In either 2004 or 2005, plaintiff worked for a brief period as a laborer for a temp service. (Tr. 206-07.)

Plaintiff testified that he was unable to work full time

---

[2]Plaintiff testified that he was "kicked out of school" (Tr. 204), but the record indicates that he withdrew on August 27, 1973. (Tr. 125.)

because of back pain and stress. (Tr. 206.) Plaintiff described his back pain as follows: "I could be standing at the kitchen sink or something for a certain period of time and it's - - it'll start acting like it wants to go out on me and stuff and by doing these heavy lifting, I'm usually down on my back for two or three days, can't get out of bed or move." (Tr. 207-08.) Plaintiff also described an incident during which he had to crawl on his hands and knees to get from room to room because of back pain. (Tr. 208.)

Plaintiff described his stress problem as "a lot of things bothering me I guess", and explained that he was unable to hold a job for very long, and unable to pay incoming bills. Id. Plaintiff was not receiving psychological treatment, and explained that he had no insurance. Id. Plaintiff had previously sought help at a free clinic and was initially approved, but later denied when his 401K plan was discovered. Id. Plaintiff testified that he cashed his 401K plan in, and was re-applying to the clinic. (Tr. 208.) Plaintiff has not collected unemployment benefits. Id.

Plaintiff testified that he has asthma and bronchitis, and is unable to walk a quarter of a mile without having to stop to catch his breath. (Tr. 209.) Plaintiff testified that he smoked four to five packs of cigarettes per day. Id. Plaintiff testified that his doctors told him to stop smoking to improve his breathing, but that he had not quit because of his nerves. Id.

The ALJ then questioned plaintiff regarding his past and present alcohol use. Plaintiff testified that he once underwent

-3-

treatment for alcohol abuse at COMTREA (Community Treatment, Inc.) after being ticketed for DWI. (Tr. 210.) Plaintiff testified that he had received approximately four DWI citations, but was never incarcerated. (Tr. 210-11.) The ALJ asked plaintiff how often, during the last year, he had consumed alcohol, and plaintiff testified that he last drank alcohol two weeks ago; that alcohol was not "one of [his] things right now"; that he was unable to afford to buy his own alcohol; and he was merely a "social drinker." (Tr. 211.) Plaintiff testified that friends occasionally brought a 30-pack of beer to drink with him at his house, but that they took any remaining beer with them when they left. Id.

Plaintiff testified that he has trouble with his right knee "wanting to go out on [him]" while walking, but that he had not sought treatment. (Tr. 212.) Plaintiff also testified that he felt he had a low I.Q., which he estimated to be a 28. Id. The ALJ asked plaintiff how long it had been since his I.Q. was checked, and plaintiff replied "I don't even remember having one." Id. Plaintiff testified that he had looked for light work through the temporary agencies, but that the only work they had for him was heavy work. (Tr. 212-13.) This concluded the ALJ's questioning of plaintiff, and plaintiff's attorney did not question him.

The ALJ then heard testimony from the VE, Mr. Magrowski. The ALJ posed a hypothetical involving a 49-year old person with nine to eleven years of education and the same past work experience

-4-

as plaintiff, with the ability to perform the full range of light work and to remember, understand, and carry out at least simple instructions and non-detailed tasks, respond appropriately to supervisors and co-workers where contact was casual and infrequent, adapt to routine and simple work changes; and who should avoid exposure to dust, fumes, odors and gases. (Tr. 213-14.) Mr. Magrowski testified that such an individual would be unable to perform plaintiff's past relevant work, but that there was work in the state and national economy that plaintiff could perform, including a game attendant or arcade attendant (2,000 jobs available locally and 200,000 nationally) and work involving simple, light assembly (3,000 locally and 300,000 nationally). (Tr. 215.) The ALJ requested sedentary jobs to use as a point of reference, and Mr. Magrowski testified that such available work included surveillance system monitor (1,000 locally and 50,000 nationally) and work as an order clerk in the food and beverage industry (1,000 locally and 50,000 nationally).

Plaintiff's attorney then asked Mr. Magrowski to assume that the hypothetical individual had an I.Q. of 60, and Mr. Magrowski testified that he would identify unskilled work, which would not affect the jobs he had already identified, according to the Dictionary of Occupational Titles ("DOT"). (Tr. 216.)

B.  Medical Records

On October 20, 2005, plaintiff presented to Osias A. Almiron, M.D., for a physical evaluation at the request of the

State Disability Determination Services. (Tr. 129-30.) Plaintiff reported that he had experienced back problems for a long time. (Tr. 129.) Dr. Almiron noted that plaintiff had moderate difficulty bending, and assessed chronic back pain. (Tr. 130.) Dr. Almiron opined that plaintiff should see an orthopedist, and that he should take medication for his back pain. Id.

The record indicates that plaintiff was admitted to St. Anthony's Medical Center on January 5, 2006 by Srinivas Chilakamarri, M.D., with complaints about a history of depression and nerves. (Tr. 145-60.) Dr. Chilakamarri noted "He is looking for a Xanax prescription." (Tr. 147.) Plaintiff reported daily consumption of 12 to 30 beers, four packs of cigarettes, and marijuana. (Tr. 147, 149.) Dr. Chilakamarri wrote "I am not sure how he is supporting this habit." (Tr. 149.)

Plaintiff complained of the following: lack of concentration, short attention span, poor organization skills, boredom, procrastination, and too much free time, financial problems, lack of motivation, transportation problems, loneliness, too much stress and responsibility, sleep disorders, lack of confidence, and addiction. (Tr. 147.) Plaintiff was noted to be evasive. (Tr. 151.) Dr. Chilakamarri noted that plaintiff was "fighting for disability", that he owed $2,000.00 in back rent, and that "his goal is to get disability." (Tr. 147.) In the History and Physical Examination report, it is noted "[t]he patient's interest is to get disability and he also wanted Xanax." (Tr.

149.)  It was also noted that plaintiff's "[i]nsight and judgment
is impaired in the sense that he wants disability and he has a
chemical dependency problem. . . . The patient says at this time he
does not understand why he is unable to get disability."  Id.  It
was noted that, one week before Christmas, plaintiff had suicidal
ideation with a plan.  Id.

        Plaintiff's physical exam was normal, and his lungs were
clear.  (Tr. 150.)  Dr. Chilakamarri noted that plaintiff had a
history of arthritis of the back, but it does not appear that
plaintiff complained of back pain to Dr. Chilakamarri.  (Tr. 149.)
He was noted to be alert and soft-spoken, with no threats of
suicide or homicide.  Id.  He was noted to have normal and average
intellect, memory, content and flow of thought, and intact
orientation.  (Tr. 149, 151.)  He was not psychotic or manic, and
was "generally in good health."  (Tr. 150.)  Plaintiff was
diagnosed with severe personality disorder with non compliance.
Id.  Dr. Chilakamarri opined that social crises primarily brought
plaintiff to the hospital, and wrote "Frankly this is a major
social crisis that brings his large global assessment function
scale to a lower number."  Id.

        Upon his January 9, 2006 discharge, Dr. Chilakamarri
noted that plaintiff had no suicidal or homicidal ideation, with no
depressive symptoms, and wrote that he saw no evidence of
schizophrenia or major mental illness, and that plaintiff's
problems were related to substance abuse.  Id.  Plaintiff, however,

-7-

stated that his problems were not related to substance abuse. (Tr. 150.) Plaintiff's discharge diagnoses were depressive symptoms; substance abuse disorder; alcohol abuse, and personality disorder with social crisis issues. (Tr. 148.) Dr. Chilakamarri prescribed Prozac,[3] Benadryl[4] for insomnia, and Thiamine[5] "to aid with his recovering brain from alcohol and drug changes." (Tr. 147.)

On March 9, 2006, plaintiff underwent a psychological evaluation with Thomas Davant Johns, Ph.D.[6] (Tr. 133-39.) Plaintiff reported back complaints, "my right knee wants to go out" and occasional inability to get out of bed. (Tr. 133.) Dr. Johns noted that plaintiff was "minimally cooperative and vague and evasive in all of his reporting especially regarding substances." Id. Dr. Johns also noted that plaintiff "appeared to be constitutionally incapable of giving a straight answer to any question, so much questioning was needed to obtain required

_____

[3]Prozac, or Fluoxetine, is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689006.html

[4]Benadryl, or Diphenhydramine, is used to treat various symptoms of allergies or the common cold; cough caused by minor throat or airway irritation; motion sickness; insomnia; and abnormal movements caused by either early stage parkinsonian syndrome or medication side effects. ttp://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682539.html

[5]Thiamine is a vitamin used by the body to break down sugars in the diet. The medication helps correct nerve and heart problems that occur when a person's diet does not contain enough thiamine. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682586.html

[6]In his Decision, the ALJ refers to Dr. Johns as "Dr. Jones." See (Tr. 18.) This appears to be a mere typographical error. See Quaite v. Barnhart, 312 F. Supp. 2d 1195, 1199-1200 (E.D. Mo. 2004) (whether misstatement is typographical error is to be determined by reading misstatement in context of entire opinion.) The undersigned further notes that plaintiff does not make note of or challenge this error.

detail." <u>Id.</u>

Regarding his alleged psychological/psychiatric problems, plaintiff initially denied to Dr. Johns that he had ever been treated psychiatrically, and then alternately admitted and denied being hospitalized and taking medications. (Tr. 133-34.) Dr. Johns noted that plaintiff did not appear to be depressed, and was in fact quite animated. (Tr. 134.) Plaintiff claimed to suffer several signs of depression, including insomnia, irritability, lack of concentration, anhedonia, hopelessness, decreased energy and decreased appetite, but could not say whether he had recently lost or gained weight. <u>Id.</u> Plaintiff reported significant daily use of alcohol, essentially drinking until he passed out. <u>Id.</u> Plaintiff had good self-esteem, however, and identified himself as a good person. <u>Id.</u> He had occasional suicidal ideation with fantasies of killing himself with a shotgun, but no prior suicide attempts. (Tr. 134.) Plaintiff had in fact recently bought a shotgun, but denied intent to harm himself. <u>Id.</u>

Plaintiff reported that he currently drank "alcohol, whiskey and beer." <u>Id.</u> Dr. Johns noted that plaintiff was "remarkably vague and evasive regarding his use and history related to substances." <u>Id.</u> Plaintiff initially reported drinking whenever he was able to borrow money to buy alcohol; then reported drinking every other day; then reported drinking every day. (Tr. 134.) He first drank alcohol at the age of 12, but did not begin daily use until two years ago, and reported that he currently

consumed "about a fifth of whiskey plus two 30-packs of beer per day." Id. He reported morning drinking, blackouts, shakes, sweats, cravings and tolerance, and four past DWI citations. Id. Plaintiff reported completing the Missouri Substance Abuse Traffic Offenders Program ("SATOP") once following a DWI. (Tr. 135.) Plaintiff also reported using marijuana two to three times per week, and consuming about six joints or 25 to 30 "one hits" per sitting. (Tr. 134-35.) He first used marijuana at age 12 or 15 but claimed that he could easily quit. (Tr. 135.) Plaintiff reported past use of other illicit drugs, but denied sustained current use and cravings, and denied drug-associated involvement in the legal system. Id.

Plaintiff also reported suffering from asthma, bronchitis, axillary cysts, sinus difficulties, and shortness of breath. Id. He suffered a past chainsaw injury to his leg, and severed toes from one of his feet. Id. Plaintiff grew up in a large family, had been married twice, and had an adult daughter from whom he was estranged. (Tr. 135-36.) He reported attending school in special education classes through the ninth grade. (Tr. 136.) Plaintiff denied juvenile justice system involvement, and denied what Dr. Johns called "a pattern of behavior throughout childhood and adolescent [sic] that is strongly suggestive of conduct disorder." Id.

Plaintiff reported that he last worked for about six weeks as a temporary laborer, and was last employed in December

-10-

2005.  Id.  He quit because he had "unreliable transportation."
Id.  He could not recall his employment prior to this, and reported
sporadic employment over the years, spending most of the time
unemployed.  (Tr. 136.)  Plaintiff reported difficulty getting
along with supervisors and being fired, but said he had no trouble
getting along with co-workers.  Id.  Plaintiff then stated that he
had trouble getting along with virtually everyone now.  Id.
Plaintiff denied then admitted prior arrests, and denied then
admitted past incarceration.  Id.  He spent some time on probation
on a DWI charge, and also completed a treatment program, as noted
above.  (Tr. 136.)

Dr. Johns noted that plaintiff was coherent, relevant and
logical, with no apparent abnormalities in his mood, stream of
speech, or mental activity.  (Tr. 137.)  He was not fully
cooperative.  Id.  Plaintiff claimed he did not know the day of the
week or the month, but when pressed, said it was April.  Id.  He
claimed to be unaware that he had presented that day for a social
security disability evaluation, although Dr. Johns noted he had
informed plaintiff of this at the outset.  Id.  Plaintiff claimed
he did not know the governor or the mayor, and could name only one
past president.  (Tr. 137.)  He had a lot of difficulty with
working memory, and when Dr. Johns asked him to count from 20 to 1,
"half the time he counted up a few before counting back down
again."  Id.  Plaintiff gave random answers for simple arithmetic,
but when confronted, could figure out the equations. (Tr. 137-38.)

-11-

When asked how a bush and a tree were alike, plaintiff initially said they were both "paper", but changed his answer to "wood" when confronted. (Tr. 138.)

Plaintiff reported being able to cook, clean, grocery shop, and do his laundry. Id. His driver's license had been revoked. Id. He described a typical day as "sitting at the kitchen table" and occasionally letting his dog out. Id. When Dr. Johns reminded plaintiff that he had reported drinking whiskey and sixty beers per day, plaintiff acknowledged that. (Tr. 138.) Plaintiff claimed he got out of the house once every four to five weeks and had no regularly scheduled social activities, but was able to take care of his own personal needs. Id.

Dr. Johns opined that, when plaintiff was abstinent, he would be capable of getting along with others and completing simple tasks in a timely manner over a sustained period of time. Id. Dr. Johns diagnosed "depressive disorder, not otherwise specified, likely related to his use of alcohol." (Tr. 139.) Dr. Johns also diagnosed plaintiff with alcohol dependence, cannabis and poly-substance abuse, "personality disorder, not otherwise specified." (Tr. 139.) Dr. Johns assessed a current GAF of 50 and opined that this was "due primarily to the claimant's dependence on alcohol and abuse of above substances." Id.

An X-ray of plaintiff's lumbar spine, taken on March 9, 2006 revealed small anterior osteophyte formation on the lumbar vertebral bodies, and slight narrowing of L5, S1 intervertebral

disc spaces. (Tr. 140.)

On March 20, 2006, James M. Spence, Ph.D. completed a Psychiatric Review Technique form. (Tr. 68-81.) Dr. Spence found that plaintiff had the medically determinable impairments of depression, personality disorder, and alcohol dependence, cannabis abuse, and poly-substance abuse, and that he had behavioral changes associated with regular use of substances. (Tr. 76.) Dr. Spence found that plaintiff had mild restrictions of activities of daily living, and moderate difficulties in maintaining social functioning and concentration, persistence and pace, but no episodes of decompensation. (Tr. 78.)

Also on March 20, 2006, Dr. Spence completed a Mental Residual Functional Capacity Assessment. (Tr. 82-85.) Dr. Spence found that plaintiff was only partially credible, and was vague regarding his substance use. (Tr. 84.) Dr. Spence found that plaintiff had no "marked" limitations. (Tr. 82-83.) Dr. Spence concluded that plaintiff was "capable of performing at least SRT (simple, repetitive tasks) away from the public on a routine basis." (Tr. 84.)

Records from St. Anthony's Medical Center indicate that plaintiff presented to the emergency room on January 27, 2007 with complaints of near syncope followed by chest pain, and a history of shortness of breath. (Tr. 179, 181.) Plaintiff was attended by emergency room physician Randall C. Speck, M.D. Plaintiff asked Dr. Speck to evaluate him for depression, and reported suicidal

-13-

ideation with no plan. (Tr. 197.) Plaintiff stated that, if he could afford it, he would drink daily. Id. Plaintiff stated he wanted to be admitted, but that he could not do so because there was no one to care for his animals. Id. Plaintiff denied back pain, and pain in his extremities. (Tr. 181.) Plaintiff complained of stress due to his lack of income and inability to pay his bills. (Tr. 197.)

Plaintiff reported smoking more than four packs of cigarettes per day. Id. A chest x-ray revealed peribronchial thickening, with no airspace consolidation or effusion, and normal heart size. (Tr. 186.) Angiogram revealed no evidence of pulmonary emboli, and chronic lung changes in the apices with probable chronic lung change at the right lower posterior lobe. (Tr. 187.) Plaintiff was given Nitroglycerin[7] and baby aspirin, and it was noted that he improved while in the emergency room. (Tr. 182, 184.) It was also noted that a "long discussion" was held with him regarding quitting smoking. (Tr. 184.) The record indicates that an attempt was made to give plaintiff a list of community clinics to visit for treatment, including COMTREA, BHR, and Catholic Family Services, but that plaintiff left the emergency room before the doctor could speak to him again and give him the list. (Tr. 197.)

---

[7]Nitroglycerin is used to prevent angina, or chest pain. It works by relaxing the blood vessels to the heart, thereby increasing the flow of blood and oxygen to the heart.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601086.html

### III. The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since January 31, 2005, and that he had the severe impairments of depression, and a personality disorder that could be aggravated by poly-substance abuse. (Tr. 15.) The ALJ also noted that plaintiff had degenerative disc disease of the lumbar spine, asthma, bronchitis and high cholesterol, but that these disorders had no more than a minimal effect upon plaintiff's ability to perform work-related activities. (Tr. 16.) The ALJ concluded that plaintiff did not have an impairment or combination of impairments of listing-level severity. Id.

The ALJ found that, while plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible. In so doing, the ALJ listed all of the factors from the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984), cited 20 C.F.R. §§ 404.1529(c) and 416.929(c), the Regulations corresponding to Polaski and credibility determination, and set forth numerous inconsistencies in the record detracting from plaintiff's credibility. (Tr. 17-19.)

The ALJ found that plaintiff could not perform his past

relevant work, but retained the residual functional capacity ("RFC") to perform the mental functions of unskilled work; to lift and carry ten pounds frequently and twenty pounds occasionally; stand, walk and sit for six hours in an eight-hour work day; and push and pull subject to those limitations. (Tr. 16.) The ALJ gave slight weight to Dr. Johns' assessment that plaintiff had a GAF of 50, inasmuch as the evidence clearly established that plaintiff was deceptive with Dr. Johns and failed to cooperate fully. (Tr. 19-20.) The ALJ found that plaintiff had the capacity to perform the mental functions of unskilled work, and that he must avoid concentrated exposure to dust, fumes, odors and gases. (Tr. 16.)

Using VE testimony, the ALJ determined that jobs existed in significant numbers in the national economy for an individual with plaintiff's age, education, work experience, and RFC. (Tr. 21.) The ALJ noted that the VE identified jobs that existed in significant numbers in the national economy even if plaintiff were limited to sedentary work. Id. The ALJ concluded that plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. The ALJ found that, while plaintiff's physical condition was limited by his combined non-severe impairments of asthma and degenerative disc disease, the mental restrictions found were consistent with performing the unskilled jobs the VE listed. (Tr. 19.) The ALJ concluded that a finding of "not disabled" was therefore

-16-

appropriate.  <u>Id.</u>

## IV.  Discussion

To be eligible for benefits under the Social Security Act, a plaintiff must prove that he is disabled.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Services</u>, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace.  It provides disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1520, 416.920.  It further specifies that a person must be both unable to do his previous work and unable, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); <u>Heckler v. Campbell</u>, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the

Commissioner utilizes a five-step sequential evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen, 482 U.S. at 140-42. The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. Pearsall, 274 F.3d at 1217, Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf

v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ;

2.    The plaintiff's vocational factors;

3.    The medical evidence from treating and consulting physicians;

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.    Any corroboration by third parties of the plaintiff's impairments;

6.    The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Briggs, 139

F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992), citing Cruse, 867 F.2d at 1184.

In the case at bar, plaintiff challenges the ALJ's RFC determination, arguing that it is unsupported by medical evidence, and that the record lacks medical evidence that plaintiff has the abilities the ALJ found. Plaintiff also argues that the ALJ failed to ensure a fully and fairly developed record; and failed to properly consider the opinions of the treating and examining physicians. Plaintiff also contends that the ALJ's decision is legally insufficient because he failed to find that plaintiff met 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.05, inasmuch as plaintiff had a low I.Q., and also failed to specifically cite Listing 12.05. Plaintiff also challenges the ALJ's reliance upon the VE's testimony, arguing that it cannot be considered substantial evidence because it was obtained using a hypothetical that did not capture the concrete consequences of plaintiff's impairments. Plaintiff also argues that the VE's testimony was incompatible with the Dictionary of Occupational Titles ("DOT"), because the VE cited jobs involving a higher reasoning level than the ALJ specified. In response, the Commissioner argues that substantial evidence supports the ALJ's decision. For the following reasons, plaintiff's arguments are not well-taken.

A.   Credibility Determination

Although plaintiff herein does not directly challenge the ALJ's analysis of plaintiff's credibility, he does challenge the RFC determination, and the undersigned will therefore begin this

analysis with an examination of the ALJ's credibility determination. <u>See</u> <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005) (it is clearly established that, before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility).

The Eighth Circuit has recognized that, due to the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. <u>Polaski</u>, 739 F.2d at 1321-22. In <u>Polaski</u>, the Eighth Circuit addressed this difficulty and set forth the following standard:

> "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions."

> <u>Id.</u> at 1322.

Although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations, he may discount such complaints if there are inconsistencies in the evidence as a whole. <u>Id.</u> The "crucial question" is not whether

the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). The foregoing Polaski factors are to be considered in addition to the objective medical evidence of record. See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). When an ALJ considers the Polaski factors and discredits a claimant's subjective complaints for a good reason, that decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for the ALJ, not this Court, to decide, and this Court considers with deference the ALJ's decision on the subject. Tellez, 403 F.3d at 957.

As noted, supra, the ALJ in this case listed all of the Polaski factors, and cited the Regulations corresponding with Polaski and credibility determination. The ALJ then thoroughly reviewed the evidence of record and noted numerous inconsistencies in the record to support the conclusion that plaintiff's complaints were not credible. The ALJ noted that plaintiff told Dr. Johns that he was able to perform all of the normal activities of daily living. Inconsistencies between subjective complaints and daily living patterns diminish credibility. Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). The ALJ also noted that plaintiff never told any medical personnel that he had difficulties with standing, or that he had any other physical limitations. The ALJ noted that the clinical findings during evaluation were "consistently at great

variance" with plaintiff's allegations of depression, and that plaintiff's complaints of inability to get along with supervisors and friends were most likely due to incidents of alcohol use, not a disabling mental condition. (Tr. 19).

The ALJ noted that plaintiff was "evasive and vague with every doctor who tried to treat him." (Tr. 19.) See Jones v. Callahan, 122 F.3d 1148, 1152 (8th Cir. 1997) (noting that ALJ may consider evidence that a claimant has exaggerated his or her symptoms when evaluating claimant's subjective complaints); see also Baldwin, 349 F.3d at 558 (ALJ properly discredited claimant's allegations of disabling impairments based upon numerous inconsistencies in the record; including the lack of objective medical evidence, and evidence that claimant gave different accounts at different times.) The ALJ also noted that plaintiff's allegation of severe breathing problems was inconsistent with his continued smoking. An ALJ may properly consider a claimant's failure to quit smoking as a factor detracting from credibility. Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997).

The ALJ noted that plaintiff did not seek ongoing medical treatment. The absence of ongoing medical treatment is inconsistent with subjective complaints of pain. See Onstead v. Sullivan, 962 F.2d 803, 805 (8th Cir. 1992); see also Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (claimant's failure to seek medical assistance for her alleged physical and mental impairments contradicted her subjective complaints of disabling

conditions).  Similarly, the ALJ noted that plaintiff did not take prescription psychiatric or other medications to alleviate his allegedly disabling symptoms, even though Prozac had been noted to help him.  The lack of prescription medication is inconsistent with allegations of disabling impairments.  Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999).

In so finding, the ALJ discredited plaintiff's assertion that he was unable to obtain free treatment and/or medicine. As the Eighth Circuit has noted, while evidence of financial hardship may justify a claimant's failure to obtain treatment or take prescription medication, it is not an automatic excuse.  Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992) (citing Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984)); Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989); Brown v. Heckler, 767 F.2d 451, 453 n. 2 (8th Cir. 1985).  The ALJ noted that, despite plaintiff's allegations of severe breathing problems, anxiety due to poverty, and an alleged inability to afford medications, plaintiff did manage to afford to smoke between three and eight packs of cigarettes per day.  The fact that a claimant does not forgo smoking to help finance medication detracts from his credibility. See Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999).

The ALJ also noted that, in January 2007, plaintiff plaintiff left the emergency room before a list of indigent medical clinics could be provided to him, having told the doctor that he did not wish to be admitted, and that the St. Louis area has many

-24-

nationally renowned agencies which provide medical care to the indigent. Assertions of lack of financial resources are not convincing where plaintiff did not take advantage of available medical assistance programs. Johnson, 866 F.2d at 275.

Furthermore, the undersigned notes that, when plaintiff saw Dr. Johns in March 2006, he reported daily consumption of alcohol, cigarettes and marijuana in quantities defying the conclusion that others bought the substances for him. The record does not indicate that plaintiff sought medical treatment or prescription medication during that time, despite his apparent ability to afford alcohol, cigarettes and marijuana. While certainly not dispositive, this is one factor supporting the ALJ's credibility determination. See Brown v. Apfel, 221 F.3d 1341 (8th Cir. 2000) (ALJ properly discounted claimant's contention that he could not afford medication and treatment absent evidence showing that claimant sought low-cost or free medical care, and given evidence suggesting that he routinely bought beer and cigarettes.)

The ALJ also noted that plaintiff appeared to be strongly financially motivated to obtain disability benefits. The ALJ wrote that, when plaintiff was seen by Drs. Speck and Johns, "he was clearly pursuing evidence to support his claim for disability", and that, at an earlier evaluation, "his stated goal was to obtain disability benefits." (Tr. 20.) The ALJ also wrote that plaintiff "suffers from little other than an obsession with obtaining benefits that would allow him to drink and not work." (Tr. 19.)

A claimant's apparent financial motivation may contribute to an adverse credibility determination when, as here, other factors cast doubt upon the claimant's credibility. Ramirez v. Barnhart, 292 F.3d 576, 581 n. 4 (8th Cir. 2002). In the case at bar, plaintiff's apparent financial motivation to qualify for benefits is only one element which supports the ALJ's credibility determination, and is considered herein along with the balance of the medical records and other evidence in the record as a whole.

A review of the ALJ's credibility determination shows that, in a manner consistent with and required by Polaski, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies detracting from plaintiff's credibility. An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ considered the Polaski factors and discredited plaintiff's subjective complaints for a good reason, that decision should be upheld. Hogan, 239 F.3d at 962.

B.   Residual Functional Capacity Determination

Plaintiff contends that the ALJ's RFC findings are in error because they are unsupported by medical evidence; that the record lacks medical evidence that plaintiff has the abilities the ALJ says he has; because the ALJ failed to fully and fairly develop the record to ensure it contained medical evidence of plaintiff's physical and mental abilities; and failed to properly consider the

opinions of treating and examining physicians. The undersigned disagrees.

Residual functional capacity is what a claimant can do despite his limitations. 20 C.F.R. §404.1545, <u>Lauer v. Apfel</u>, 245 F.3d 700, 703 (8th Cir. 2001). At the fourth step, while the burden of proof is still upon the claimant, the Commissioner determines whether the claimant has the RFC to perform his or her past relevant work, and if so, the claimant is determined not disabled. <u>Pearsall</u>, 274 F.3d at 1217. If not, however, the process continues to step five, where the burden shifts to the Commissioner to prove both that the claimant retains the RFC to perform other kinds of work, and that such work exists in substantial numbers in the national economy. <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000) (citing <u>Nevland</u>, 204 F.3d at 857.) The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995); <u>Goff v. Barnhart</u>, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a). A claimant's RFC is a medical question, however, and some medical evidence, along with all other relevant, credible evidence in the record, must support the ALJ's RFC determination. <u>Id.</u>; <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711-12 (8th Cir. 2001); <u>Lauer</u>, 245 F.3d at 703-04; <u>McKinney v. Apfel</u>, 228 F.3d 860, 863

(8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217, McKinney, 228 F.3d at 863.

In the case at bar, the ALJ thoroughly analyzed the medical evidence of record and concluded that nothing therein suggested that plaintiff had any disabling impairments. Regarding plaintiff's allegations of disabling back pain and cardiopulmonary impairments, the ALJ noted that spinal x-rays showed only mild narrowing between L5 and S1, and that extensive testing in January 2007 ruled out a cardiac condition, and found only slight pulmonary abnormalities.

Regarding plaintiff's allegations of disabling depression, the ALJ noted that there was no evidence of episodes of decompensation in a work or work-like setting, and that the clinical findings during evaluations were consistently at great variance with plaintiff's allegations of depression. The ALJ noted that, in January 2006, Dr. Chilakamarri did not even diagnose plaintiff with depression, diagnosing him instead with depressive symptoms not otherwise specified. The ALJ also noted that, when plaintiff was interviewed upon admission, he was found to have no memory difficulties and an average intellect, but limited insight

and judgment because he wanted disability benefits and was abusing substances.

The ALJ properly considered the lack of any objective medical evidence in the record suggesting that plaintiff had any disabling physical or mental impairment, and properly considered the evidence suggesting that plaintiff's impairments were at most mild. While the lack of objective medical evidence is not dispositive, it is an important factor, and the ALJ is entitled to consider the fact that there is no objective medical evidence to support the degree of alleged limitations. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); Kisling v. Chater, 105 F.3d 1255, 1257-58 (8th Cir. 1997); Cruse, 867 F.2d at 1186 (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered); Battles, 902 F.2d at 659 (ALJ properly denied benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time); Johnson v. Chater, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in the record for the ALJ's determination).

The undersigned also notes that plaintiff did not complain of back pain to Dr. Speck in January 2007. See Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting allegations of back pain when no complaints made

-29-

about such pain while receiving other treatment).  The ALJ noted that plaintiff had no ongoing medical treatment, and was not taking prescription pain medication.  <u>See</u> <u>McClees v. Shalala</u>, 2 F.3d 301, 302-03 (8th Cir. 1993) (ALJ properly denied benefits to claimant who was seeking them for period during which claimant did not seek medical treatment, other than for a skinned elbow, and during which claimant was not taking any pain medication).

Furthermore, plaintiff testified that he left his last job due to unreliable transportation, and did not indicate that he left the job due to any physical or mental disability.  (Tr. 136.) This is inconsistent with a finding of disability.  <u>Kelley v. Barnhart</u>, 372 F.3d 958, 961 (8th Cir. 2004) (citing <u>Browning v. Sullivan</u>, 958 F.2d 817, 823 (8th Cir. 1992) (finding that a cessation of work for reasons unrelated to medical condition militated against a finding of disability)).

Although plaintiff correctly asserts that an ALJ's decision regarding a claimant's RFC must be based upon medical evidence, an ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance.  <u>Pearsall</u>, 274 F.3d at 1217.  "The need for medical evidence, however, does not require the Secretary to produce additional evidence not already within the record." <u>Anderson</u>, 51 F.3d at 779.  An ALJ may issue a decision without obtaining additional medical evidence when, as here, other evidence in the record provides a sufficient basis for the ALJ's decision.

Id., citing Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994).

Plaintiff contends that the ALJ failed to properly consider "the opinions of the treating physicians and examining physicians." (Plaintiff's Brief at 12.) Plaintiff's argument is not well-taken.

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole." Hogan, 239 F.3d at 961. Furthermore, the opinion of a consulting physician who examines a claimant once does not generally constitute substantial evidence. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). An ALJ is entitled to discredit or even disregard the opinion of a physician if other medical assessments are supported by superior medical evidence, or where the physician has offered inconsistent opinions. Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996).

Plaintiff notes that Dr. Johns assessed plaintiff with a 50 GAF; that plaintiff had a 30 GAF upon admission to St. Anthony's Hospital in January 2006; and had a 40 GAF in January 2007. In his decision, the ALJ noted that Dr. Johns had assessed a GAF of 50, and that Dr. Speck had assessed a GAF of 40. However, the ALJ found it significant that, when plaintiff was evaluated for disability by Dr. Johns, and when he was seen by Dr. Speck in January 2007, he was evasive, if not deceitful, and was clearly pursuing an evaluation that would be favorable to his disability claim. The ALJ also noted that Dr. Speck had found plaintiff to have a normal

psychiatric evaluation, and did not admit him to the hospital.

For these reasons, the ALJ declined to give controlling weight to the GAF assessments of Drs. Johns and Speck, and instead noted that he placed greater weight upon the opinion of Dr. Chilakamarri, who treated plaintiff during his January 2006 hospital stay, and found that plaintiff had no depressive symptoms and was normal when discharged from the hospital in January 2006. Such reliance is supported in part by the fact that, of all of the physicians who treated or examined plaintiff, Dr. Chilakamarri had the longest treatment relationship with plaintiff.  An ALJ is free to credit the opinion of one physician over another when his or her assessments are supported by better or more thorough medical evidence.  Prosch v. Apfel, 201 F.3d 1010, 1014 (8th Cir. 2000). Furthermore, in considering the weight to give to a physician's opinion, an ALJ must consider the length of the treatment relationship and the frequency of examinations.  Casey v. Astrue, 503 F.3d 687, 691 –692 (8th Cir. 2007).

The undersigned notes that, while plaintiff was indeed assessed with a low GAF upon admission to the hospital in 2006, upon discharge Dr. Chilakamarri found he exhibited no depressive symptoms.  The undersigned finds no error in the weight the ALJ afforded to the medical opinions in this case.

1.  Listing 12.05

Plaintiff argues that the ALJ erred in finding that his impairments did not meet Listing 12.05, inasmuch as the record

supported the conclusion that plaintiff had I.Q. test scores in the 50s. Plaintiff further alleges error in the ALJ's failure to specifically cite Listing 12.05 or articulate a legally sufficient rationale referable thereto. Plaintiff's arguments are not compelling.

The listing for mental retardation, Listing 12.05, 20 C.F.R. Pt. 404, Subpt. P., App. 1 (2001), describes mental retardation as, "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." To show a sufficiently severe disorder under subsection (C) of Listing 12.05, an applicant must show "[a] valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function."

In this case, the record contains plaintiff's school records indicating that, while a student, plaintiff underwent I.Q. testing on five occasions, achieving scores ranging from 92 to 46. (Tr. 126.) The last two scores, apparently obtained in 1969 and 1971, were 50 and 58, respectively. Id.

While an I.Q. test is helpful in determining whether an applicant has a mental impairment, it is not dispositive, and other information illustrating the claimant's ability to function can be used to discredit the results of an I.Q. test. Johnson v.

-33-

<u>Barnhart</u>, 390 F.3d 1067, 1071 (8th Cir. 2004)(citing <u>Holland v.</u>
<u>Apfel</u>, 153 F.3d 620, 622 (8th Cir. 1998)). The Eighth Circuit has
emphasized that I.Q. scores must be valid; that the Commissioner
need not rely exclusively on I.Q. scores; and that the Commissioner
may disregard test scores that are inconsistent with a claimant's
demonstrated activities and abilities as reflected in the record as
a whole. <u>Muncy v. Apfel</u>, 247 F.3d 728, 733 (8th Cir. 2001); <u>Clark</u>
<u>v. Apfel</u>, 141 F.3d 1253, 1255 (8th Cir. 1998).

Plaintiff did not claim low I.Q. or mental retardation in
his applications. However, because plaintiff testified that he
felt he was unable to work because his I.Q. was 28, the ALJ
properly recognized the need for further inquiry and investigated
the claim. <u>See</u> <u>Battles v. Shalala</u>, 36 F.3d 43, 44-45 (8th Cir.
1994) (an ALJ has an obligation to investigate a claim not
presented in the application for benefits when testimony at the
hearing places him on notice of the need for further inquiry.) The
ALJ noted that, according to the Diagnostic and Statistical Manual
of Mental Disorders, 4th Edition, an I.Q. of 28 indicated severe
retardation, with the ability to communicate only minimally and
learn no more than basic self-care needs. The ALJ's failure to
specifically reference plaintiff's school records or past I.Q.
tests is of no consequence, inasmuch as an ALJ is not required to
explicitly discuss every piece of evidence submitted, and failure
to cite to certain evidence does not mean it was not considered.
<u>Brewster v. Barnhart</u>, 366  F.Supp. 2d 858, 872 (E.D. Mo., 2005),

citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

In concluding that plaintiff did not have a mental impairment of listing level severity, the ALJ specifically discussed the many ways in which plaintiff's demonstrated activities and abilities reflected in the record as a whole were not consistent with an I.Q. meeting § 12.05 criteria. The Eighth Circuit has held that an ALJ may reject I.Q. scores when, as here, they are inconsistent with the rest of the record. Clark, 141 F.3d at 1255. The ALJ found that, even considering plaintiff's alcohol and poly-substance abuse, plaintiff was not functionally impaired. The ALJ noted that plaintiff had no episodes of decompensation in a work or work-like setting; noted that plaintiff was only mildly limited in concentration, persistence or pace; and that there was further no "evidence of the "C" criteria for any of the Section 12.00 categories in Appendix 1." (Tr. 16.) The ALJ also noted that plaintiff testified that he had sold his 401K assets in order to regain his eligibility for indigent medical care, and noted that such an action was inconceivable by one with intellectual impairments as severe as plaintiff alleged. (Tr. 19.) The ALJ also noted that plaintiff presented no evidence of significant sub-average intellectual functioning, and the undersigned notes that, when plaintiff was hospitalized in January 2006, it was noted he was of average intellect.

The undersigned also notes that the record contains no evidence (nor does plaintiff argue) that the I.Q. scores in

plaintiff's school records are actually valid. The tests themselves are not included in the record, and there is no evidence that they were performed by qualified personnel, or even reviewed by qualified personnel and deemed valid. In order to meet the requirements of § 12.05, I.Q. scores must be valid. Muncy, 247 F.3d at 733; Clark, 141 F.3d at 1255. The undersigned also notes that plaintiff engaged in substantial gainful activity for a number of years since his last I.Q. test, and the record contains no evidence that plaintiff's intellect has since worsened. A condition that was present but not disabling during working years and has not worsened cannot be used to prove a present disability. Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (per curiam); Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990). Furthermore, the ALJ considered a potential reduction in cognitive ability by limiting plaintiff to unskilled work.

Despite plaintiff's assertion to the contrary, the ALJ's failure to specifically cite to § 12.05 is of no consequence. The fact that the ALJ wrote that he found no evidence "of the "C" criteria for any of the Section 12.00 categories in Appendix 1" indicates that he indeed considered 12.05, inasmuch as § 12.05 is contained within § 12.00.

### 2. Fully and Fairly Develop the Record

Plaintiff next contends that the ALJ erred inasmuch as he failed to fully and fairly develop the record with respect to plaintiff's physical and mental limitations, and also suggests that

the ALJ erred by not re-contacting physicians. The undersigned disagrees.

It is well-settled law that the ALJ is required to ensure a fully and fairly developed record. Nevland, 204 F.3d 853 (citing Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983)). Included in this duty is the responsibility of ensuring that the record contains evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue. Nevland, 204 F.3d at 858; see Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004). An ALJ is also required to re-contact a physician when the ALJ is unable to determine from the record whether the claimant is disabled. Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). In this case, however, there is no indication that the ALJ felt unable to make the assessment he did, and, as explained supra, substantial evidence supports his RFC determination. An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision. Anderson, 51 F.3d at 779.

Plaintiff also fails to recognize that the ALJ's RFC determination was influenced by his determination that plaintiff's allegations were not fully credible, and this Court defers to that determination. See Tellez, 403 F.3d at 957 (citing Hogan, 239 F.3d at 962 (deference to ALJ is appropriate when he explicitly discredits claimant and gives good reasons for doing so)). The

undersigned therefore determines that the ALJ fulfilled his duty to fully and fairly develop the record, and was under no obligation to re-contact any of the physicians involved herein.

A review of the ALJ's RFC determination reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence on the record as a whole. The ALJ based his decision on all of the relevant, credible evidence of record, including the objective medical evidence, medical opinion evidence, and plaintiff's treatment records, and properly discredited plaintiff's allegations of physical and mental limitations precluding all work. The undersigned therefore concludes that the ALJ's RFC determination is supported by substantial evidence on the record as a whole.

C. <u>Vocational Expert Testimony</u>

Plaintiff next challenges the VE's testimony, arguing that it cannot be considered substantial evidence because it was based upon a hypothetical that did not capture the concrete consequences of plaintiff's impairments. The undersigned disagrees.

"A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." <u>Hunt v. Massanari</u>, 250 F.3d 622, 625 (8th Cir. 2001) (citing <u>Prosch</u>, 201 F.3d at 1015). As explained, <u>supra</u>, substantial evidence supports the ALJ's RFC and credibility determinations. Likewise, his

hypothetical question included all the impairments he found to be credible.  See Strongson, 361 F.3d at 1072 –1073 (VE's testimony constituted substantial evidence when ALJ based his hypothetical upon a legally sufficient RFC and credibility determination.)  It was permissible for the ALJ to exclude "any alleged impairments that [he] has properly rejected as untrue or unsubstantiated."  Hunt, 250 F.3d at 625 (citing Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997)).

Plaintiff also contends that, because the jobs the VE cited involved reasoning levels of two and three, they are outside the parameter of the hypothetical which asked the VE "to assume simple repetitive tasks."  (Plaintiff's Brief at 15.)  The undersigned disagrees.

In the hypothetical posed to the VE, the ALJ specified a claimant able to perform light work and to "understand, remember, and carry out at least simple instructions and nondetailed tasks; can respond appropriately to supervisors and coworkers in a task oriented setting where contact with others is casual and infrequent and can adapt to routine, simple work changes."  (Tr. 213) (emphasis added.)  The ALJ also found that plaintiff's mental restrictions were consistent with performing unskilled work, which requires little or no judgment to do simple duties that can be learned on the job in a short period of time, or 30 days.  See 20 C.F.R. §§ 404.1568, 404.968.  The ALJ did not specify that plaintiff was limited to "simple repetitive tasks."  See Id.

-39-

Based upon the ALJ's hypothetical, the VE identified the jobs of game attendant (342.657-014, reasoning level 3); arcade attendant (342.667-014, reasoning level 2); and simple assembly (712.687-010, reasoning level 2). (Tr. 215); see Dictionary of Occupational Titles, www.oalj.dol.gov. When the ALJ asked the VE to offer jobs at the sedentary level as a point of reference, the VE identified the jobs of surveillance system monitor (379.367-010, reasoning level 3), and order clerk in the food and beverage industry (209.567-014, reasoning level 3). Id. The VE testified that his testimony was consistent with the DOT and the Selected Characteristics of Occupations. Id. When asked by plaintiff's attorney to assume an I.Q. of 60, the VE testified that he could identify unskilled work, which would not affect the jobs he had already identified according to the DOT. (Tr. 216.)

As the Commissioner correctly notes, the Eighth Circuit has recognized that DOT reasoning levels of 2 and 3 are consistent with unskilled work. Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007). Furthermore, neither reasoning level two nor three conflicts with the specific limitations the ALJ specified in his hypothetical. The Eighth Circuit has held that reasoning level three is consistent with limitations to simple, repetitive and routine tasks, a limitation more stringent than the ALJ herein indicated. Hillier v. Social Security Administration, 486 F.3d 359, 367 (8th Cir. 2007) (expert's opinion that claimant who was limited to following "simple, concrete instructions" could work as a cashier was not inconsistent with Dictionary of Occupational Titles description of cashier as requiring level three reasoning).

Even assuming, _arguendo_, that one could conclude that reasoning level three conflicted with the ALJ's limitation, the VE noted two jobs existing in substantial numbers in the local and national economies involving only reasoning level two, which has also been found to be consistent with limitation to "simple and routine" tasks. _See_ _Hackett v. Barnhart_, 395 F.3d 1168, 1176 (10th Cir. 2005) (level-two reasoning is consistent with plaintiff's RFC to "simple and routine work tasks"); _Money v. Barnhart_, 91 Fed. Appx. 210, 214 (3rd Cir. 2004) (reasoning level two is consistent with restriction to simple, routine and repetitive work.)

Furthermore, the undersigned notes that the ALJ did not opine plaintiff was limited only to simple tasks; he opined that plaintiff was limited to jobs involving the ability to understand, remember, and carry out _at_ _least_ simple instructions and non-detailed tasks. According to Appendix C of the DOT, reasoning level 3 requires one to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form, and deal with problems involving several concrete variables in or from standardized situations.[8] Reasoning Level 2 requires one to "[a]pply commonsense understanding to carry out detailed _but_ _uninvolved_ written or oral instructions, and deal with problems involving a few concrete variables in or from standardized situations." _Id._ Of particular note is the qualifier used in reasoning level 2 defining the instructions the employee would be required to follow as "uninvolved", implying simplicity. Also

---

[8] _See_ DICTIONARY OF OCCUPATIONAL TITLES, Appendix C, Components of the Definition Trailer. www.oalj.dol.gov.

notable is that both reasoning levels specify that only "commonsense understanding" was necessary to perform the job duties.

Based upon the foregoing, the undersigned determines that the VE's testimony constituted substantial evidence that there are jobs in substantial numbers in the local and national economies that plaintiff can perform.

Therefore, for all of the foregoing reasons, the Commissioner's decision is supported by substantial evidence on the record as a whole. Because there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may exist which would have supported a different outcome, or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001; Browning, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.

_Frederick R. Buckles_
FREDERICK R. BUCKLES
UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of July, 2008.